[Civ. No. 2199.  Second Appellate District.—February 24, 1917.]

## VERNE H. LINCOLN, Respondent, v. PACIFIC ELECTRIC RAILWAY COMPANY (a Corporation), Appellant.

APPEAL—FINDINGS—CONFLICT OF EVIDENCE.—The appellate court will not disturb a finding of fact by the trial court, or the implied finding of a jury that is supported by evidence, if the evidence is conflicting.

ID.—NEGLIGENCE—INJURY TO MOTORMAN OF INTERURBAN TRAIN—RUNNING INTO OPEN SWITCH—LACK OF CONTRIBUTORY NEGLIGENCE.—In this action by a motorman of an interurban electric train to recover damages for personal injuries sustained from the running of his train into an open switch causing collision with a local car, it is held that the evidence is sufficient to support the implied findings of the jury that the plaintiff was not negligent in driving his train into the switch in disregard of switch lamp signals, or in approaching the switch point with the train not under control and prepared to stop, as required by the defendant's rules.

ID. — COMPARATIVE NEGLIGENCE — EFFECT OF STATUTE. — Where at the time of the occurrence of such accident there was a statute in force providing that an employee's contributory negligence should not be a bar to recovery for personal injuries where his negligence was slight, and that of the employer was gross, in comparison, but the damages might be diminished in proportion to such contributory negligence (Stats. 1911, p. 796), the plaintiff, even if found to be negligent, is not precluded from recovery if the jury believed his negligence was slight in comparison with that of his employer; and where such an instruction is given, it will be presumed that the jury properly assessed damages, making due allowance in accordance with the facts found and as required by the statute.

APPEAL from a judgment of the Superior Court of Los Angeles County, and from an order denying a new trial. Grant Jackson, Judge.

The facts are stated in the opinion of the court.

Frank Karr, R. C. Gortner, and A. W. Ashburn, Jr., for Appellant.

John S. Steely, and Jones & Evans, for Respondent.

CONREY, P. J.—This is an action wherein an employee of an interurban electric railway company seeks to recover damages for personal injuries alleged to have been sustained by the negligence of the employer. The defendant denied all allegations of negligence and as a separate defense alleged contributory negligence on the part of the plaintiff. The defendant has appealed from a judgment in favor of the plaintiff and from an order denying its motion for a new trial.

The accident occurred at Long Beach, California, on February 6, 1913, at about 6:10 P. M. Plaintiff was and had been for several years a motorman of the defendant, running trains upon its line between Los Angeles and Long Beach. American Avenue is a double avenue of the city of Long Beach, lying on the east and west sides respectively of a private right of way of the defendant company. On that right of way defendant has double tracks running north and south. At a point between Fifteenth and Fourteenth Streets a curved track leads from the south-bound main track of defendant, swinging gradually southwesterly into Fourteenth Street. In addition to its interurban cars, the defendant operated local cars, called the Willowville cars, and it was the custom to run Willowville cars into the curve above mentioned so as to allow the through trains south-bound to pass them on the main line. On the evening in question a Willowville car was running southward, followed by a three-car train of which plaintiff Lincoln was the motorman. The crew of the local car consisted of the motorman, Lysaght, and the conductor, Jesse Dunn.

At the point of divergence of the curved track from the south-bound main track and on the west side of the tracks, there was a switch-stand on which was established a switch which was operated by a lever for the purpose of opening and closing the switch, which when opened gave access from the main tracks to the curved track. The switch was operated by a hand lever, and a part of the apparatus consisted of devices for signaling. These devices consisted of colored

lights and also of flat sheets of metal called wings. When the switch was closed and locked and the main line in order, the white wings were perpendicular to the main track and the red wings were parallel to the main track, green lights alone showing. When the switch was open for a train to take the siding, the red wings were perpendicular to the main track and the white wings parallel thereto, red lights alone showing. In throwing the switch, the top part of the switch would move through an angle of ninety degrees. The rules and regulations of the transportation department of the defendant company then in force were well known to the above-named employees, Lincoln and Dunn. Subdivision B of article 142 of those rules was as follows: "After a regular train clears the main track and switches are properly set for the main track, the conductor must step to the side of the track opposite the switch-stand until after the opposing train has passed, keeping his hand-lantern at night in full view of the approaching train, but giving no proceed signal." Rule 112 was as follows: "Trainmen must not accept a proceed signal as against fixed signals, until they are fully informed of the situation and know they are protected. When fixed signals are in operation, trainmen must not give proceed signals against them."

On the occasion in question, in order to let a through train from Los Angeles ·pass a local car, the crew of the local car stopped at the switch between Fifteenth and Fourteenth Streets. It was the duty of Dunn, conductor of the local car, to operate the switch for the passing of these cars. Dunn stepped to the ground, holding in his hand a red and a white lantern; he gave to the motorman of the through train, Lincoln, a signal with his red lantern requiring Lincoln to stop or slow down until the local car should have been taken out of the way. Dunn then went forward on the ground to the switch to open it so that his local car might get off the main line. The lamp of the switch-stand then showed a green light northward and southward ·in conformity with a closed switch. Dunn opened the switch and the signals changed accordingly. The Willowville car proceeded and entered the switch, going ahead therein until its rear stood at the curb line between the railroad right of way and the westerly division of American Avenue, about 138 feet from the switch point. Conductor Dunn, his local car having entered the switch, should then

have thrown the handle of the switch westward again to close the switch, which would have caused the red light to disappear on the switch lamp and the green light to throw its rays northward toward the approaching through train. Both parties contend, and the evidence tends to show, that Dunn did not completely close the switch, but the parties do not agree upon the fact as to what Dunn actually did do. Appellant contends that Dunn left the switch entirely open in front of the through train and that he closed it to cover up his fault immediately after the through train had passed into the curved track and the accident had happened. Respondent contends that Dunn closed the switch in front of the through train at least so far as to change the red light to green, and that the through train got into the curve in spite thereof. At any rate, it is the fact that the train swung into the curve without cutting, bruising, or marking either of the switch points or any of the rails, and crashed into the rear end of the Willowville local car, whereby the plaintiff was injured.

Immediately behind the three-car train which had just entirely passed into the curved track, the switch was found set for the main track and with the green light showing properly northward and southward. Dunn, the conductor of the local car, denied that he had so set the switch after the collision. Two witnesses testified that they saw the light change its north and south rays from red to green immediately behind the train. Counsel in their briefs agree as to what were the respective theories upon which the case was tried. Respondent's theory is that Conductor Dunn left the switch partly open, so that the flange of the right-hand front wheel of the first car engaged with the west point of the switch, which extends northerly one and three-quarters inches farther than the east point of the switch, and threw the switch instantly fully open and thus allowed the train to swing into the curve without derailment. Appellant's theory is that Conductor Dunn left the switch entirely open and that respondent brought his train into the curve against a red light and into an open switch.

Appellant concedes, of course, the rule that this court will not disregard a finding of fact by the trial court, or the implied finding of a jury, that is supported by evidence tending to support such finding; and that if the evidence is conflicting, the finding based thereon will not be disturbed. But

appellant contends that the physical facts shown, and against which there is no evidence, compel the conclusion that the plaintiff was guilty of contributory negligence directly and proximately causing the accident.   Under this general contention counsel for appellant urge four propositions.   (1) That plaintiff was negligent in driving his train toward and into the switch, in disregard of the danger indicated by the lamp thereon, and the company's rules concerning same.   (2) That plaintiff was negligent in approaching the switch point not under control, prepared to stop, as required by the rules of the company.   (3) That if plaintiff approached said switch under full control, prepared to stop, then he negligently failed to stop within the distance intervening.   (4) That the evidence is insufficient to establish any negligence against defendant, except in the failure of Dunn to close the switch, and plaintiff was equally negligent in that event.

(1) The evidence is sufficient to support the implied finding against defendant on the first proposition.   The plaintiff did not run into an open switch, with a red signal displayed against him.   But it is argued that the switch could not have been entirely closed, for then the train would have remained on the main line.   Let this be admitted.   Then it is said by appellant's counsel that it is inconceivable that the switch could have been sufficiently open to have allowed the train to enter it, without a corresponding misdirection of the rays of the lamp signal; that to run toward a signal imperfectly displayed is as much negligence as to run against a full red light.   In this connection our attention is directed to rule 125 of the company: "A signal imperfectly displayed . . . must be regarded as a stop signal."   In accordance with this rule the court instructed the jury that if they believed from the evidence that as the plaintiff approached the switch-stand, the lamp signal thereon was imperfectly displayed, such imperfectly displayed signal or absence of signal was then and there according to said rule, a stop signal, requiring plaintiff to stop his train before reaching the switch; and that a violation of that rule by the plaintiff would constitute negligence. To find a verdict for the plaintiff under this instruction, the jury must have believed from the evidence that the signal was not imperfectly displayed.   Is the evidence of the physical facts so far beyond doubt that this finding could not be true? Appellant relies upon the evidence which shows the construc-

tion and mode of operation of the switch, and certain photographs which were taken on April 23, 1913, which show the appearance of the switch and its signals in three positions, to wit, when the switch is open, when the switch is closed, and when the switch is half open; and contends that from that evidence the flange of the front right-hand wheel, which would touch the switch first, could not have passed to the right of the point of the switch rail, unless there was an opening of at least one inch at the switch point, which obviously could not be done without affecting the position of the switch lamp and causing its lights to become imperfectly displayed. These facts are relied upon to overcome the testimony of the several witnesses who testified that as the train approached the switch the green light was fully displayed; the contention being that it was physically impossible for this testimony to be true. But there are facts which impair the conclusiveness of this argument. Conductor Dunn, in describing what he did after his Willowville car had gone beyond the switch, said: ''Then I picked up the switch lever and swung it around and threw it down, and looked up at the light and it was green and I stepped across the track and gave the high-ball. I could not say whether I locked that switch when I threw it back or not, nor could I say whether I lowered the lever all the way down over the dog or not. After Mr. Lincoln answered me by two toots, his train came on down the line and took the switch without any warning.'' Lee Higgins was conductor of the front car of the three-car train. He had been conductor on the Willowville line some time before the time of this accident and had operated the switch referred to herein—it having then the same system of locks and keys as at the time of the accident. He testified ''that the points of the switch do open—the one opening on the west and the other on the east closing, when the lever is begun to be moved, just begun to be moved, and yet the sign shows green.'' There thus appears to be some testimony, which the jury was entitled to believe, that the red light would not necessarily begin to show instantly at the beginning of the motion of the lever which was closing the switch; and that the accident may have been caused by failure of Dunn to effectually close and fasten down the switch toward which plaintiff's train was moving. It is therefore entirely conceivable that on account of the jarring of the train immediately before it reached the

switch, or from some other cause, the switch opened enough to throw the train over to the curved track and yet that the plaintiff would never have seen anything in the signal contradicting its first message to him indicating that the switch was safely closed.

(2) Rule 146 was as follows: "Trains must approach all . . . meeting and passing points, under full control, and prepared to stop." There is no exactly prescribed definition of the conditions amounting to full control, nor of the precise limitations of a preparation to stop. These elements would differ according to the machinery and weight and length of trains or cars, and according to local conditions of tracks and grades. Of course it means a control and a preparation appropriate to the probable emergencies, and has for its purpose the avoiding of accidents. The plaintiff testified that when the Willowville car stopped, to go over to the curved track, his train was running at the rate of one or two miles per hour, and was a thousand feet behind the local car. Then when the train advanced, he picked up speed. "I was going when I struck the switch, about twelve to fifteen miles an hour; fifteen miles would put it to the limit." At that time "I had no electricity on at all." "The Willowville car was then standing at the curb line, between the right of way and the street, with the back end of it at that point, which is 138½ feet in a straight line from the switch-stand. Going at twelve or fifteen miles an hour, it would be impossible to stop a three-car train in that distance." Plaintiff's testimony as to speed of his train on arriving at the switch was confirmed by numerous witnesses. Counsel for appellant call attention to the fact that six expert motormen testified that even at fifteen miles an hour, this train could have been stopped in fifty to seventy-five feet. There is no other evidence to the contrary, other than plaintiff's testimony showing how he used the stopping devices, and that nevertheless he failed to stop within the distance required to avoid the collision. The testimony of those motormen may favor appellant with respect to the next proposition which we are to discuss, but it really confirms the verdict as to the present question, for it entitled the jury to find that plaintiff had his train under full control, and prepared to stop, if they believed that his speed did not exceed fifteen miles per hour.

(3) Then why did the plaintiff not stop his train in time

to avoid the collision? His failure to do so is urged by appellant as establishing beyond doubt the contributory negligence of the plaintiff. In discussing this proposition we will assume that plaintiff had complied with the rule above stated, and that he came to the switch with his train under full control and prepared to stop. If this were not so, the plaintiff would have been negligent. For in view of the purpose of that rule it would be entirely beyond reason to hold that a properly managed train, if under full control and prepared to stop, would meet the emergency which this train faced, by running 138 feet into the rear of a loaded car, and going thirty-five feet farther after the collision, before the train stopped.

What, then, was the defect in management which caused this train to go on as far as it did go? The train was equipped with devices for reversing the current through the motors, and also was equipped with air-brakes. There is no claim that any of these were defective or insufficient. It follows, as the night the day, that something was wrong with the plaintiff's management of the machinery committed to his care. His testimony was that when he reached the switch he felt the car raise up and bump, like it had struck something, and immediately he realized that something was wrong, as his train went in on the siding. "The second I felt the jar or raising up, I reversed the current to check the train as quick as I could, and I held it there until I felt the train begin to go ahead again, and it felt like the breakers went out, and I then turned on the emergency brake. I figured that was the quickest way to check the train. . . . If it gets too heavy a charge—for instance, reversing the train—the breakers are put on there expressly to keep the motors from being burned up; and it felt like when I reversed it that it went out; and just the minute I felt the resets or breakers had begun to go, I put it in the emergency, as I thought that was the quickest way to stop the train. . . . I did all that was possible to stop the train and I did not stop it until the collision came. . . . I put on the air as soon as I felt the train give way to the breakers or it felt like the breakers were gone." All of the six motormen who said that a train of the kind in question and operating under the stated conditions could be stopped within eighty feet or less, specified that this would be done by using the air-brakes. A train moving at the rate of twelve miles per hour will travel 138

feet in about eight seconds. There is no statement in evidence showing how much time was consumed by the plaintiff in using the "reverse" before he applied the air-brakes. Assuming—since the testimony on the point is not contradicted —that the train must have stopped within eighty feet after the air-brakes were applied, and remembering that even when retarded by the collision the train did not stop until it had traveled 173 feet from the switch, it must be true that the plaintiff traveled ninety-three feet and used up five seconds of his precious time before he applied the air-brakes. But although defendant's witnesses declared that by full and instant use of the air-brakes the train could have been stopped within eighty feet, they admitted a high degree of efficiency in the method of stopping a train, in emergencies, by reversing the current, a process which also reverses the direction of motion of the car-wheels. It was admitted by one of these men, who had been employed as an instructor for the motormen, that the motormen were sometimes instructed to use the reverse, in emergencies, "under certain conditions," to stop trains. Also, "after applying the power and finding the power would not stop it, then applying the air under those conditions, he could do nothing else." Under the testimony, the jury may have believed that it was a mistake of judgment for the plaintiff to have tried the effect of the "reverse" before using the air-brakes, and yet that this error did not amount to negligence. And even if the jury found that the plaintiff was negligent, this fact did not necessarily require that the verdict be in favor of the defendant. At the time when this accident occurred there was in force a statute which changed in important respects the law relating to the liability of employers for injuries sustained by their employees while engaged in the line of duty of their employment. In section 1 of that act we find that in actions to recover damages for personal injuries thus sustained, "in which recovery is sought upon the ground of want of ordinary or reasonable care of the employer, or of any officer, agent or servant of the employer, the fact that such employee may have been guilty of contributory negligence shall not bar a recovery therein where his contributory negligence was slight and that of the employer was gross, in comparison, but the damages may be diminished by the jury in proportion to the

amount of negligence attributable to such employee." (Stats. 1911, p. 796.) The court instructed the jury in accordance with these provisions of the statute and it is not suggested that there was any error in the instructions given. It is entirely consistent with the verdict that, although the jury might have attached the taint of negligence to the conduct of the plaintiff, yet that under the evidence they believed that his negligence was slight and that the negligence of the defendant "was gross, in comparison." If so, it is to be presumed that in assessing damages the jury made due allowance in accordance with the facts found and as required by the statute.

(4) The fourth point is that, if the defendant was negligent by reason of the failure of Dunn to close the switch, then the plaintiff was equally negligent. For reasons which are made apparent by what we have said in discussing the other points considered, this court cannot say that the plaintiff was "equally negligent" with the defendant. The evidence was such that the jury's finding upon the facts must be accepted as final.

On cross-examination of the plaintiff, after the plaintiff had testified that as he approached the switch the light signal facing him was green, he said: "And then as I came along, going ten or fifteen miles an hour, my entire train entered that switch. I do not account for it at all." Defendant's attorney then asked: "There is no way to account for it, is there?" Plaintiff's attorney objected to this question as improper cross-examination and calling for a conclusion of the witness, and the objection was sustained. Appellant suggests that the witness had testified as to his long experience as a motorman; as to speed, stopping of trains, interpretation of signals, and so on; and contends that it was error to refuse permission to ask him how he could account for the fact that the train entered the switch. While the objection might very well have been overruled, we do not think that the defendant was seriously prejudiced by the contrary ruling. The further testimony elicited on the same cross-examination seems to have covered all of the matters which probably would have been developed by or followed upon an answer to the above quoted question. Several other alleged errors in rulings upon evidence are pointed out by appellant, but in their relation

to the record they seem even less important than the objection which we have discussed.

The judgment and order are affirmed.

James, J., and Shaw, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on March 26, 1917, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on April 23, 1917.